# EXHIBIT 5

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

|  |  |
|---|---|
| NICHOLAS J. LOUISA, ESQ. | ) |
| Plaintiff, | ) |
| v. | ) |
| NETFLIX, INC., NETFLIX WORLDWIDE ENTERTAINMENT, LLC, JIGSAW PRODUCTIONS LLC, MUDDY WATERS PRODUCTIONS LLC, ALEX GIBNEY, RICHARD PERELLO, STACEY OFFMAN, PETER KNOWLES, SAMANTHA KNOWLES, LISA SIEGEL BELANGER, LONNIE BRENNAN and the BOSTON BROADSIDE, | ) |
| Defendants. | ) |

Civil Action No. 2081CV01945

## AMENDED COMPLAINT AND JURY DEMAND

### i. Introduction

1.      This is an action for defamation and other civil wrongs by which Plaintiff seeks

redress for Defendants' unlawful, outrageous, and improper destruction of his reputation and other

damages.   In the midst of an ongoing global pandemic during which much of the world's

population has been quarantined at home watching television, certain of the above-named

Defendants published or appeared in an episode of the NETFLIX series DIRTY MONEY entitled

"GUARDIANS, INC." (the "Episode").   The Episode, which remains available on NETFLIX,

purports to be concerned with the alleged misuse of legal guardianship proceedings.

2.      The Episode focuses on the supposed experience of an elderly individual from

Needham named John Savanovich ("Mr. Savanovich"), who the Episode falsely claims was

"exploited" by the "sinister" Plaintiff Nicholas J. Louisa, Esq. ("Plaintiff" or "Attorney Louisa").
The Episode reports, falsely, that Attorney Louisa committed crimes and ethical violations in
fleecing a "bewildered" Mr. Savanovich out of millions of dollars by causing the police to remove
him from "his childhood home" and transferring him "against his wishes . . . to an assisted living
facility" so that he and his colleague could sell Mr. Savanovich's real estate and leave him "totally
penniless" and a "ward of the state." The Episode followed, but substantially expanded upon in
its falsehoods, other Defendants' publications in a local Boston newspaper, which similarly falsely
reported wrongdoing concerning Mr. Savanovich.

3.      Defendants' published statements of and concerning Attorney Louisa are false and
defamatory. He is a private citizen and, as such, needs only prove here that Defendants'
negligently published their falsities. Based upon the evidence here, however, it is clear that
Defendants' actions were intentional and undertaken in order to sensationalize a story. As alleged
herein, Defendants published their false statements of and concerning Attorney Louisa with a
demonstrable knowing and reckless disregard of their falsity.

4.      As one example only, certain Defendants knowingly gave a global audience to and
relied upon only two "sources," both of whom are individuals who they knew were, in fact, utterly
not credible and could not be relied upon to report the truth. The first of these individuals was Mr.
Savanovich himself, who Defendants knew full well had been adjudicated by a court to be an
incapacitated person under disability and someone who suffers from conditions known to prevent
him from recalling and reciting past events accurately. Defendants failed to report these facts.
Defendants similarly knew that the second individual they relied upon, Defendant Lisa Siegel
Belanger ("Ms. Belanger"), is an attorney who had been and remains the subject of a Board of Bar
Overseers disciplinary proceeding to suspend her law license because of her unethical behavior

related specifically to her crusade against guardianships. Defendants were aware that public findings against Ms. Belanger had already led to a recommendation of a multi-year suspension of her law license for, among other things, making false statements in court and baseless accusations of corruption against attorneys, judges, and even the members of the Board of Bar Overseers arising from or related to guardianship proceedings, including one involving her own father. Defendants failed to publish any of this information. For her part, having been given an audience by her co-defendants, Ms. Belanger knowingly and repeatedly spewed lies about Attorney Louisa throughout her appearance in the Episode.

5.      Defendants have caused the destruction of Plaintiff's reputation. As a result of the publication of these false stories, Attorney Louisa has been subjected to threats and harassment that continues today. His life has been unfairly and unlawfully upended. Defendants are responsible in damages for the harm they have caused.

## ii. Parties

6.      Attorney Louisa is an individual and a resident of Middlesex County, Massachusetts. He was formerly Of Counsel at the law firm of Russell & Associates, LLC ("R&A"), which is located in Needham, Norfolk County, Massachusetts, and a colleague of R&A's principal, Peter Russell, Esq. ("Attorney Russell"). Now, Attorney Louisa does business exclusively as The Law Office of Nicholas J. Louisa.

7.      Defendant Netflix, Inc. ("Netflix") is a media-services provider and production company that streams media content worldwide to its subscribers. Upon information and belief, it is a Delaware corporation with a principal place of business in the State of California.

8.      Defendant Netflix Worldwide Entertainment, LLC ("Netflix WE") is, upon information and belief, a wholly owned subsidiary of Netflix. According to the ending credits of

the Episode, Netflix WE owns the Episode's trademarks and copyrights and "is the author of this motion picture for the purpose of copyright and other laws." Upon further information and belief, it is a Delaware limited liability company with a principal place of business in the State of California.

9. Defendant Jigsaw Productions LLC ("Jigsaw") is a media production company with a focus on producing documentaries. Upon information and belief, it is a Delaware limited liability company with a principal place of business in the State of New York. Jigsaw's executive team includes Defendants Alex Gibney, Richard Perello, and Stacey Offman.

10. Defendant Muddy Waters Productions LLC ("Muddy Waters") is a wholly owned subsidiary of Jigsaw. Upon information and belief, it is a New York limited liability company with a principal place of business in the State of New York. Muddy Waters' team includes Defendants Samantha Knowles ("Ms. Knowles") and Peter Knowles.

11. Upon information and belief, Ms. Knowles is associated with Jigsaw as well as Muddy Waters and represented both, along with Netflix and Netflix WE, in producing the Episode (collectively, Netflix, Netflix WE, Jigsaw, Muddy Waters, Alex Gibney, Richard Perello, Stacey Offman, Ms. Knowles, and Peter Knowles, the "Netflix Defendants"). She is an individual and, upon further information and belief, a resident of the State of New York.

12. Ms. Belanger is an individual and, upon information and belief, a resident of Essex County, Massachusetts. She holds a law degree and has been a member of the Massachusetts Bar, but the Board of Bar Overseers has recently recommended a two-year suspension of her license because of unethical behavior related to her crusade against guardianships.

13.     Defendant Lonnie Brennan ("Mr. Brennan") is an individual and a resident of Essex County, Massachusetts.  Upon information and belief, he is the sole publisher and owner of the Boston Broadside (the "Broadside").

14.     The Broadside is a newspaper with monthly print circulation in New England, as well as an online edition available worldwide at www.bostonbroadside.com.  Upon information and belief, the Broadside is an unincorporated trade name used by Mr. Brennan for his newspaper's publication (together, Mr. Brennan and the Broadside, the "Broadside Defendants").   The Broadside has a Post Office Box in Peabody, Essex County, Massachusetts.

### iii. Jurisdiction and Venue

15.     This Court has jurisdiction over this matter pursuant to G.L. c. 212, § 4.

16.     Venue is proper in this Court pursuant to G.L. c. 223, § 1, as Attorney Louisa is a resident of County.

### iv. Background

**A.      The Sterling Professional Reputation of Attorney Louisa.**

17.     Attorney Louisa is a private citizen and a well-respected attorney with significant professional accomplishments.

18.     Attorney Louisa is a licensed attorney in the Commonwealth of Massachusetts and a member in good standing of the Massachusetts Bar.  He is also a member in good standing of the Bars of the States of Florida, New Jersey, and New York.  Attorney Louisa graduated *cum laude* from the University of Miami with a Bachelor of Business Administration and a 4.0 grade point average in his accounting major.  Then, Attorney Louisa graduated *magna cum laude* from the University of Miami School of Law.  He was in the top 10% of his law school class, and he

was inducted into *The Order of the Coif*. While in law school, Attorney Louisa served as an editor of his school's law review and interned with a federal judge and the U.S. Attorney's Office.

19.    Upon graduation, Attorney Louisa worked in the litigation department of a highly respected national law firm before relocating to Massachusetts, where he associated with R&A and established his own practice doing business as The Law Office of Nicholas J. Louisa. Throughout his career, Attorney Louisa has assisted clients with a wide range of litigation matters. Since establishing The Law Office of Nicholas J. Louisa, Attorney Louisa's primary motivation has been to provide individuals and small businesses with the quality and sophistication of legal representation that he previously provided to global corporate entities and their officers and directors through his work at the prominent national law firm where he began his legal career. In addition to his private individual and small business clients, Attorney Louisa devotes a substantial portion of his legal practice to working as a bar advocate, where he zealously defends one of the most vulnerable populations – indigent clients facing criminal charges and involuntary civil commitments – at a discounted hourly rate approved and paid by the Commonwealth of Massachusetts.

**B.    Attorney Louisa's Representation of Mr. Savanovich.**

20.    Mr. Savanovich retained R&A in late 2015 for legal assistance with threatened receivership proceedings by the Town and the Attorney General's Office related to real estate that he owned in the Town.

21.    At the time, Mr. Savanovich was 74 years old. He had never married or had any children, and he was the only child of deceased parents.

22.     Mr. Savanovich grew up in in a single-family home located at 26 Highland Terrace in the Town ("26 Highland Terrace").  As of 2015, Mr. Savanovich had not lived there for approximately five (5) years.

23.     Mr. Savanovich also owned five other neighboring parcels improved by duplex, two-family homes on the immediately parallel public way of Riverside Street (the "Riverside Properties").  As of 2015, Mr. Savanovich had been sleeping in one of those properties, 49-51 Riverside Street ("49-51 Riverside"), for approximately five (5) years.

24.     At one time, Mr. Savanovich had rented out all ten units in the Riverside Properties. However, by late 2015, they had all fallen into severe disrepair and had not been rented for approximately 20 years.

25.     For over a decade, the Town had been attempting to get Mr. Savanovich to address the condition of his properties.  There had been multiple complaints from neighbors, and the Town believed that the condition of 26 Highland Terrace was in violation of multiple code provisions. Examples of public records with neighbor complaints and the Town's efforts to have them addressed by Mr. Savanovich are attached hereto as **Exhibit A**.[1]

26.     On December 15, 2016, the Attorney General's Office and the Town filed a receivership proceeding in Dedham District Court against Mr. Savanovich.  A copy of the public filings to commence this proceeding are attached hereto as **Exhibit B**.

27.     According to the filings, Mr. Savanovich had allowed 26 Highland Terrace to fall into a level of disrepair that "in its [then] present condition [was] unfit for human habitation and endanger[ed] or materially impair[ed] the health, safety and well-being of occupants, neighbors, and/or the public."  To name just a few of its problems, the property was not in compliance with

---

[1] Where appropriate, exhibits are redacted to protect personal information.

sanitary and building codes, created wildlife refuge concerns, was being used to store abandoned and unregistered vehicles, there was trash and debris strewn throughout the yard, and the exterior shrubbery was overgrown and contributing to the risk of rodent and pest harborage.

28.     R&A, through Attorney Louisa, appeared on behalf of Mr. Savanovich in this proceeding.  To aid in Attorney Louisa's ability to assist him, Mr. Savanovich executed two powers of attorney in favor of R&A in March of 2017, which allowed R&A's representatives, such as Attorney Louisa, to act on his behalf.  Before agreeing to and signing either document, Mr. Savanovich provided comments and revisions.

29.     With the help of Attorney Louisa, Mr. Savanovich was able to settle the receivership proceeding.  As agreed, Mr. Savanovich had 26 Highland Terrace listed for sale for $350,000 on a multiple listing service by a Massachusetts-licensed real estate broker, and he ultimately sold it to a developer for $480,000 on July 13, 2017 (which was the highest offer received).  Mr. Savanovich signed all relevant documents to execute the transaction.  A copy of the Quitclaim Deed signed by Mr. Savanovich, which has been a matter of public record since its recording in July of 2017, is attached hereto as **Exhibit C**.

30.     After more than $283,000 of the proceeds from the sale were used by Mr. Savanovich to pay past due property taxes, penalties, and interest for 26 Highland Terrace and the Riverside Properties, the Attorney General's Office and the Town dismissed the receivership proceeding.  The remainder of the proceeds from the sale of 26 Highland Terrace remained in R&A's client account at the time.

31.     The deplorable conditions of the Riverside Properties rendered them unrentable and susceptible to a second receivership proceeding.  Therefore, in addition to paying past due property taxes, penalties, and interest for Riverside Properties, the Attorney General's Office conditioned

its dismissal of the receivership proceeding on Mr. Savanovich's promise to, at the very least, address the severe landscaping issues with the Riverside Properties and remove all trash and rubbish strewn about the properties.

32.     In the months that followed, while he tried to assist Mr. Savanovich in complying with his obligations to address the landscaping and trash issues with the Riverside Properties, Attorney Louisa (and Attorney Russell) became increasingly concerned about Mr. Savanovich's well-being and his risk of him being financially exploited.  He had stopped returning calls and refused to meet.  R&A had also started receiving calls and inquiries from strangers asking about the status of the sale proceeds from 26 Highland Terrace.

33.     On December 28, 2017, Attorney Louisa received a telephone call from the Town's Director of Public Health, informing him that a neighbor had requested a wellness check after observing what appeared to be frostbite on Mr. Savanovich's face.  The Town's Police, Fire, and Health Departments and its Council on Aging all responded to 49-51 Riverside.

34.     When Mr. Savanovich refused to answer the door, the Town's public safety officers forced their way inside.  They found Mr. Savanovich living in uninhabitable, deplorable conditions and suffering from apparent frostbite and hypothermia.  He was taken to a local hospital for treatment.  A copy of the Needham Police Department's Incident Report, a public record, is attached hereto as **Exhibit D**.

35.     Mr. Savanovich's living conditions at 49-51 Riverside were horrifying.  The duplex was packed full of debris, garbage, old newspapers, old soda and milk bottles, and hundreds of bottles of what appeared to be urine.  Mold and mildew were visible everywhere.  There was no heat.  The pipes were all frozen, and ice was visible in the upstairs bathroom and sink.  The kitchen appliances were inaccessible and covered in clutter and refuse.  There was no furniture, and Mr.

Savanovich appeared to have little to no personal belongings.  Mr. Savanovich had been sleeping on the floor on two old couch cushions.  There were large stacks of unopened mail that included pension and Social Security checks and past due bills.  Most disturbingly, there was a dead cat in the same freezer where Mr. Savanovich was storing his food.

36.     The following day, the Town sent a letter to Attorney Louisa and Mr. Savanovich directing that Mr. Savanovich could not return to 49-51 Riverside until its condition was substantially improved.  A copy of this letter, a public record, is attached hereto as **Exhibit E**.

37.     A few days later, Mr. Savanovich was discharged from the hospital.  On the hospital's recommendation, he agreed to be transferred to a rehabilitation facility.

38.     Pursuant to the general power of attorney that Mr. Savanovich had granted in March of 2017, Attorney Louisa retained an elder law attorney to assist Mr. Savanovich with a protective services investigation that had been commenced after his hospitalization.  That investigation followed a mandatory report by the Needham Police Department to an elder services non-profit.  The elder law attorney also assisted Mr. Savanovich with other estate planning and asset protection issues.  Separately, Attorney Louisa secured private care management services for his client.

39.     After being discharged from the rehabilitation facility, Mr. Savanovich decided to move into a senior living facility, Traditions of Dedham, that required substantial monthly expenses.  He chose Traditions of Dedham over alternatives that were presented to him.  Returning to 49-51 Riverside was not an option for Mr. Savanovich because it had been condemned by the Town and the protective services investigators would not permit him to do so.

40.     In order to cover Mr. Savanovich's increased expenses and to address his past due and newly accruing bills and tax liabilities, Mr. Savanovich needed to sell at least one of the Riverside Properties.  He did not have enough liquid assets to sustain himself otherwise.  The

Riverside Properties were in such horrid condition that repairing all of them was not a feasible option, and Mr. Savanovich's continued ownership created significant legal exposure as they were uninsured, uninsurable, and posed a continued risk of a second receivership proceeding. The alarming condition of the Riverside Properties had even become the subject of an article in the Needham Times in April of 2018, a copy of which is attached hereto as **Exhibit F**.

41.     Attorney Louisa, along with Attorney Russell, Mr. Savanovich's elder law attorney and long-time accountant, all beseeched Mr. Savanovich to act rationally and sell at least one of the Riverside Properties. But he ignored and avoided his advisors and declared his unwillingness. His illogical intransigence – combined with the events of the preceding months and the circumstances that led to his hospitalization – bolstered the concern that Attorney Louisa had for Mr. Savanovich's safety and well-being.

42.     While staying at Traditions of Dedham, Mr. Savanovich was examined by a licensed psychiatrist. He was diagnosed with two disorders that impact his ability to recall and recite past events accurately. One of those diagnosed conditions, hoarding disorder, was later published by the Broadside.

43.     Under Rule 1.14 of the Massachusetts Rules of Professional Conduct, Attorney Louisa had an ethical obligation to take protective action if he was concerned about Mr. Savanovich's physical or financial well-being, including seeking a guardianship or conservatorship.

44.     In compliance with these ethical obligations, in May of 2018, Attorney Louisa petitioned the Norfolk County Probate and Family Court (the "Probate Court") for a guardianship and a conservatorship over Mr. Savanovich. Attorney Louisa had never had to act based upon this

- 11 -

particular ethical obligation before in his career, and he has not had to do so since. Neither has Attorney Russell.

45.      After consideration of the circumstances in an evidentiary proceeding, which included a review of medical documentation as required by law, the Probate Court (Ward, J.) determined that Mr. Savanovich was an incapacitated person under disability. The Probate Court appointed a guardian and a conservator to protect his interests and impounded the entire court file.

46.      The Probate Court appointed E. Alexandra Golden, Esq. ("Attorney Golden") as conservator for Mr. Savanovich to handle his financial affairs.

47.      Shortly after Attorney Golden's appointment as conservator and a separate guardian appointment, R&A's and Attorney Russell's representation of Mr. Savanovich concluded. In November of 2018, Attorney Louisa's representation of Mr. Savanovich also concluded. Neither R&A nor Attorneys Louisa or Russell have represented Mr. Savanovich since November of 2018 or billed him for their continued efforts to help him.

48.      Attorney Golden petitioned the Probate Court to have R&A's remaining pre-conservatorship invoice paid in May of 2018. After its payment was approved by the Probate Court, Attorney Golden took control of the remaining proceeds from 26 Highland Terrace as well as Mr. Savanovich's other assets.

**C.      The Probate Court Approves the Sale of the Riverside Properties.**

49.      After her appointment, Attorney Golden marketed the Riverside Properties, including listing them on a multiple listing service through a Massachusetts-licensed real estate broker, and received numerous offers. In late summer of 2018, after a bidding war, Attorney Golden accepted the highest offer received to purchase the Riverside Properties, an all-cash offer in the amount of $3,115,000. Given Mr. Savanovich's difficult financial circumstances and

increasing expenses, she petitioned the Probate Court for authority to sell these properties in August of 2018 to the buyer who made the all-cash offer of $3,115,000.

50.     The Probate Court appointed a well-respected Boston attorney, Lisa M. Cukier, Esq. ("Attorney Cukier"), to pursue Mr. Savanovich's objection to the sale after he voiced his opposition. Attorney Cukier vigorously opposed the sale on his behalf.

51.     The Probate Court carefully considered the proposed sale of the Riverside Properties. It accepted competing briefing from Attorney Golden and Attorney Cukier. It also ordered the preparation of a *Guardian Ad Litem* report by an independent third party on whether the sale was appropriate and in Mr. Savanovich's best interests. A hearing was held to allow for arguments from the attorneys as well.

52.     On November 19, 2018, the Probate Court allowed Attorney Golden's petition to sell the Riverside Properties finding the sale to be in Mr. Savanovich's best interests. Prior to the closing of the sale of the Riverside Properties, Attorney Cukier visited the Riverside Properties, including 49-51 Riverside, to independently evaluate their condition and determine whether there were any personal possessions of Mr. Savanovich that should be removed. Attorney Cukier declined to remove anything from Riverside Properties on Mr. Savanovich's behalf, explaining that they appeared to contain only garbage and a bio-hazard crew would be necessary to even go through their contents or have the garbage removed.

53.     The Riverside Properties were sold for $3,115,000 in late 2018. Attorney Golden executed a Fiduciary Deed for the properties specifically referencing the authority that she had obtained from the Probate Court. A copy of this Fiduciary Deed, which has been a matter of public record since its recording in November of 2018, is attached hereto as **Exhibit G.**

54.     The proceeds from the sale of the Riverside Properties were placed in Mr. Savanovich's account with Attorney Golden.   Pursuant to legal requirements, Mr. Savanovich's funds are bonded, insured, and accounted to the Probate Court by Attorney Golden.

55.     To this day, Attorney Golden assists Mr. Savanovich with handling his expenses and provides him with regular accountings of how his money is being handled.   He also receives a certain amount each month to spend at his discretion and has been informed that he can receive additional funds upon request.

**D.      Ms. Belanger's Involvement in the Probate Court Proceedings.**

56.     On April 10, 2019, Ms. Belanger interjected herself into Mr. Savanovich's ongoing proceedings in the Probate Court by claiming to be Mr. Savanovich's self-selected attorney.   At the time, Mr. Savanovich was still determined to be an incapacitated person under disability and remained under guardianship and conservatorship.

57.     In attempting to enter her appearance in the Probate Court, Ms. Belanger falsely claimed that Attorney Cukier's representation of Mr. Savanovich had ended.   This assertion ignored and directly contradicted an existing order from the Probate Court.

58.     Attorney Golden asked the Probate Court to strike Ms. Belanger's appearance.

59.     Attorney Cukier sought instructions from the Probate Court on what she should do.

60.     At a status conference on April 24, 2019, Ms. Belanger, without any factual or legal basis, misrepresented in open court that Attorney Golden, Attorney Cukier, Attorney Russell, and Attorney Louisa, among others, were financially exploiting Mr. Savanovich.   She further claimed that the impoundment of the case file was part of the cover up of their fraud, and she accused the Hon. George F. Phelan ("Judge Phelan"), who was overseeing the Probate Court proceedings, of lacking the ability to be an impartial jurist.   Her baseless and unhinged accusations, including those she made against the presiding Justice, were further detailed in a subsequent motion.

61.     During the status conference, Judge Phelan decided to permit Ms. Belanger to review the Probate Court's impounded file.  He cautioned, however, that the file remained impounded and that she had not been accepted as Mr. Savanovich's counsel.

62.     Given that Mr. Savanovich had been determined to be an incapacitated person under disability and that he remained under guardianship and conservatorship, the Probate Court followed the law and ordered an evidentiary hearing on whether Mr. Savanovich had capacity to retain his own counsel.  The Probate Court appointed Tracy D. Galloway, Esq. ("Attorney Galloway") to represent Mr. Savanovich in this proceeding.

63.     The Probate Court's evidentiary proceeding to determine Mr. Savanovich's capacity to retain his own counsel was completed on June 17 and 18, 2020, but remains under advisement.  However, Mr. Savanovich no longer seeks to have Ms. Belanger serve as his attorney.  Rather, he has attempted to have multiple other attorneys appear on his behalf since the middle of 2019 despite being represented by both Attorney Cukier, generally, and Attorney Galloway, specifically as to his capacity to retain his own counsel.

**E.     Ms. Belanger's Copying and Distribution of Impounded Court Records to Ms. Knowles and the Broadside, and the Contemporaneous Production of the Episode.**

64.     On May 13, 2019, mere weeks after the initial status conference at which Ms. Belanger interjected herself, counsel for Attorney Golden filed a motion asking the Probate Court to prohibit Ms. Belanger from accessing the impounded files.

65.     The basis for Attorney Golden's motion was the discovery of a recently published article by Mr. Brennan in the Broadside's May 2019 edition (the "May 2019 Article").  The article disclosed personal financial and medical information about Mr. Savanovich and included extensive quotes from and pictures of impounded court documents.  A copy of the May 2019 Article is attached hereto as **Exhibit H.**

- 15 -

66.     Attorney Golden's motion further requested that Ms. Belanger be prohibited from disclosing or disseminating information contained in the impounded files and further prohibiting her from purporting to act as Mr. Savanovich's attorney, as the May 2019 Article claimed.

67.     The Probate Court held a hearing on Attorney Golden's motion on May 16, 2019 (the "May 2019 Hearing"). All attorneys were present. The May 2019 Hearing was open to the public and, evidently, the media. For reasons unknown at the time, Ms. Knowles was in the courtroom as well, and she had a professional camera crew waiting in the Probate Court's parking lot, one of the locations where Ms. Knowles filmed Mr. Savanovich that day. A videographer from the Broadside was in the parking lot as well.

68.     During the May 2019 Hearing, Judge Phelan was given and reviewed a copy of the May 2019 Article. It discussed Ms. Belanger's own experiences with a guardianship over her father and falsely suggested that she represented Mr. Savanovich. During the hearing, Ms. Belanger elaborated on her crusade against her father's guardianship and guardianships in general, her federal lawsuit related to both (which was dismissed three times), and the resulting discipline she was facing with the Board of Bar Overseers. She also displayed many of the same irrational, grossly unprofessional, and unethical behaviors that resulted in that proceeding.

69.     During the May 2019 Hearing, Mr. Savanovich's personal and medical circumstances that had led to his protective status were discussed in open court.

70.     Despite being quoted extensively in the May 2019 Article, Mr. Savanovich stated in open court that he was unfamiliar with the Broadside and had never seen the article.

71.     Upon information and belief, Ms. Belanger arranged for Ms. Knowles' presence in the courtroom for the May 2019 Hearing in order to advance her crusade against guardianships.

72.     Upon information and belief, Ms. Belanger arranged for a representative of the Broadside to be at the Probate Court in order to advance her crusade against guardianships.

73.     As a result of the May 2019 Hearing, the Probate Court ordered a *Guardian Ad Litem* investigation into how impounded material from its file ended up with the Broadside in the May 2019 Article and whether it had been disclosed to other third parties as well.  It also ordered that Ms. Belanger was not to present herself, purport to, or hold herself out as Mr. Savanovich's counsel until the issue of his capacity to retain independent counsel was resolved.

74.     The Broadside then published a second article covering the May 2019 Hearing and Judge Phelan's resulting orders in its June 2019 edition (the "June 2019 Article").  The June 2019 Article advanced the same false narrative included in the May 2019 Article and being pushed by Ms. Belanger, and it even published a copy of one of the impounded orders from Judge Phelan.  A copy of the June 2019 Article is attached hereto as **Exhibit I**.

75.     During the course of the resulting *Guardian Ad Litem* investigation, Ms. Belanger was deposed.  She invoked the 5th Amendment when asked even the most basic questions about her involvement with Mr. Savanovich and the dissemination of the impounded material.

76.     In August of 2019, the *Guardian Ad Litem* investigator issued a report determining that Ms. Belanger had violated the Probate Court's impoundment order in providing a copy of Mr. Savanovich's entire court file to Ms. Knowles.  Ms. Belanger was also found to be responsible for the disclosure of impounded material to the Broadside that led to the May 2019 Article.  The Probate Court later credited this report.

77.     The Netflix Defendants knew of this report, recklessly disregarded it, or should have been aware of it before they completed or began streaming the Episode.

- 17 -

78.     In the months before and following Ms. Knowles' attendance at the May 2019

Hearing and her receipt of the impounded file from Ms. Belanger, the Netflix Defendants produced

the Episode. They relied heavily on the May 2019 Article and the Probate Court's impounded file.

Upon information and belief, the Netflix Defendants received further updates from Ms. Belanger

on Mr. Savanovich's case. They also filmed interviews with Mr. Savanovich and Ms. Belanger.

79.     In June of 2019, Ms. Knowles sent a series of emails to Attorney Russell. She

misleadingly asked him if he would agree to be interviewed for a documentary on "the importance

of real estate planning, especially as you age," and she attempted to fraudulently induce him into

executing media releases under this false pretense. She later shared a link to the May 2019 Article

and asked Attorney Russell for comment. In response, Attorney Louisa denied any wrongdoing

by R&A or its attorneys and explained that they could not comment any further due to the attorney-

client privilege and the Probate Court's impoundment order. Copies of these emails are attached

hereto as **Exhibit J**.

80.     In January of 2020, the Board of Bar Overseers issued its disciplinary decision on

Ms. Belanger's conduct related to her father's guardianship proceeding, her crusade against

guardianships, and the federal lawsuit that she had brought (which was dismissed three times and

affirmed on appeal by the United States Court of Appeals for the First Circuit).

81.     In deciding to recommend a two-year suspension of her license, the Board of Bar

Overseers determined that Ms. Belanger had made "false statements" in court and "false and

inflammatory statements" about others involved in the judicial process. Its findings were stunning

and further described Ms. Belanger's unethical behavior, in part, as follows:

> We are troubled by [Ms. Belanger's] propensity to hurl conclusory
> and demagogic allegations against litigants, counsel, and judicial
> officials (including members of the hearing committee), particularly
> where we can discern no basis for the arguments other than [her]

- 18 -

own displeasure. We are not persuaded by rhetoric of this nature. To the contrary and as we will discuss in the context of the sanction, such invective reflects poorly on [Ms. Belanger's] fitness to practice law. . . .

[U]nderlying all of the misconduct, we are disturbed by [Ms. Belanger]'s efforts to take advantage of her elderly father when he was confused and perhaps mentally ill, causing him to withdraw $85,000 for her own benefit as well as attempting to steal $6 million. . . .

This is a serious and troubling case. In addition to [Ms. Belanger]'s misbehavior in the underlying litigations (multiple, intentional violations of court orders; false statements in court; false and inflammatory allegations about judges; attempts to take advantage of her vulnerable father), we and the hearing committee witnessed for ourselves her utter lack of respect for the bar discipline process, her apparently willful ignorance of her ethical obligations as a lawyer, and her lack of insight into her own misconduct.

A copy of the Board of Bar Overseers' memorandum related to Ms. Belanger, which is a matter of public record, is attached hereto as **Exhibit K**.

82.     The Netflix Defendants knew of this disciplinary decision, recklessly disregarded it, or should have been aware of it before they completed or began streaming the Episode.

**E.     The Airing of the Episode.**

83.     On March 11, 2020, Netflix released the Episode to a worldwide audience. It purports to tell the story of Mr. Savanovich's guardianship proceedings as an example of how the guardianship process can be abused to exploit the elderly. Perplexingly, it confuses the differences between guardianships and conservatorships in Massachusetts. But that is only the beginning of its falsities and misleading inaccuracies.

84.     For its version of events, the Episode relies exclusively on interviews with Mr. Savanovich and Ms. Belanger as well as innuendo about what they claim occurred. The Netflix Defendants, however, knew that neither was a credible source, recklessly disregarded their lack of credibility, or should have known it to be the case.

85.    The Netflix Defendants also knew that the story presented by Mr. Savanovich and Ms. Belanger in the Episode was false, recklessly disregarded its falsity, or should have known of its falsity.  Upon information and belief, Ms. Belanger provided Ms. Knowles and the Broadside with the entire impounded file from the Probate Court.  Ms. Knowles also attended the May 2019 Hearing, and a representative from the Broadside attended a separate hearing on Mr. Savanovich's case in Probate Court on May 2, 2019 (and possibly other hearings as well).  The Netflix Defendants had access to public records concerning the condition of Mr. Savanovich's properties, the receivership proceeding commenced by the Town and the Attorney General's Office, and easily accessible information about Ms. Belanger's discipline.

86.    Clearly more interested in telling a sensational story that fit their false narrative of guardianship abuse than one that was accurate, the Netflix Defendants published the Episode anyway.  It continues to stream worldwide to this day on Netflix and remains billed and advertised as "A Netflix Original Documentary Series" to its subscribers.  A transcript of the Episode is attached hereto as **Exhibit L**.

**F.    The False Version of Events Presented in the Episode.**

87.    It is impossible to list here each and every defamatory statement or innuendo contained in the Episode.  Without limitation and as examples only, the following are statements and innuendo of facts published in the Episode that the Netflix Defendants knew to be false, recklessly disregarded their falsity, or should have known to be false.

88.    The Episode begins with the Netflix Defendants claiming through quotes from Mr. Savanovich that he has "never received any proceeds" from the sale of the Riverside Properties, "not even $2." They also quote Mr. Savanovich as claiming that he is "totally penniless" and that "the judge said I'm not allowed any financial resources whatsoever[,] I'm a ward of the state." He later states that he receives only "$300 every 20 days." By the end of the Episode, the viewer is

- 20 -

led to believe by the Netflix Defendants that this is due to the supposed misdeeds of Attorney Louisa, among others.

89.     These statements published by the Netflix Defendants are false and defamatory of and concerning Attorney Louisa.  Mr. Savanovich has received millions of dollars in proceeds from the sale of his real estate.  Those proceeds are held by Attorney Golden, who has regular accounting obligations to both to the Probate Court and Attorney Cukier.  Mr. Savanovich is given money each month to use at his discretion and has access to additional funds upon request.  Most fundamentally, Attorney Louisa did nothing but follow his ethical obligations, and his representation of Mr. Savanovich ended in November of 2018, shortly after Attorney Golden's appointment.

90.     In the Episode, the Netflix Defendants falsely present Ms. Belanger as Mr. Savanovich's attorney, thereby purporting to give her credibility in her defamatory accusations against Attorney Louisa.  Ms. Belanger was never recognized by the Probate Court as Mr. Savanovich's attorney, and she was ordered by the Probate Court not to present herself, purport, or hold herself out as Mr. Savanovich's attorney.  The airing of the Episode further violated that order.

91.     Throughout the Episode, the Netflix Defendants intersperse interviews with supposed experts so as to falsely represent to viewers that they are condemning the conduct of Attorney Louisa.  These third parties – without providing any indication that they are familiar with Mr. Savanovich's case – discuss "abuse of guardianship laws," "elder abuse," and the "national problem" and "epidemic" of "guardianship fraud" and "exploitation" that includes "over-medication" and "double-billing" by "predator" guardians that commit criminal "theft" as part of

a "capitalist dystopia." The Netflix Defendants' suggestion that Attorney Louisa engaged in any unethical, unprofessional, or criminal behavior is false and defamatory.

92.     In the Episode, the Netflix Defendants and Mr. Savanovich claim that Mr. Savanovich is "bewildered" at how he lost his property, and viewers are led to believe through the Netflix Defendants quoting Ms. Belanger that this is because Mr. Savanovich had been "exploited" by Attorney Louisa and put into guardianship. These statements are false and defamatory. Mr. Savanovich personally agreed to sell 26 Highland Terrace in order to resolve the receivership proceeding, and he personally signed all relevant documents for that transaction. *See, e.g.,* Ex. C. The sale of the Riverside Properties required Attorney Golden to obtain permission from the Probate Court, and it is a matter of public record that the sale was conducted pursuant to a *License to Sell* issued by the Probate Court. *See* Ex. G. It was the Probate Court – not any attorneys – that looked at Mr. Savanovich's medical condition, the squalor in which he had been living, his inability to handle his own finances or take care of his own health, and found that he needed protective status for his own safety and wellbeing.

93.     In the Episode, the Netflix Defendants and Mr. Savanovich suggest that the only issues with 26 Highland Terrace were merely shrubs and the need for a new roof. These statements are false and defamatory as they suggest to viewers that Attorney Louisa took advantage of a relatively small legal problem that Mr. Savanovich was facing. The problems with 26 Highland Terrace were severe and detailed by the Town and the Attorney General's Office in their receivership proceeding. *See, e.g.,* Exs. A, B.

94.     In the Episode, the Netflix Defendants, Mr. Savanovich, and Ms. Belanger claim that Mr. Savanovich was duped into signing a power of attorney as part of R&A's scheme to steal his assets. This is false and defamatory. Mr. Savanovich provided comments and revisions before

signing either of these two documents, and it is a matter of public record that neither power of attorney was even invoked to sell any of his real estate. *See* Exs. C, G.

95.    In the Episode, the Netflix Defendants state that Attorney Russell "declined to be interviewed." This statement is false, misleading, defamatory, and utterly lacking in journalistic integrity or ethics. Ms. Knowles' request was unprofessional, deceitful, and an attempted ambush, and the statement ignores Attorney Louisa's explicit denial of any wrongdoing. *See* Ex. J.

96.    In the Episode, the Netflix Defendants and Mr. Savanovich accuse Attorney Louisa of being responsible for the police taking him from what the Episode contends is "his childhood home" and that he "was transferred against his wishes from the hospital to an assisted living facility." These statements are false and defamatory. Mr. Savanovich sold his childhood home, 26 Highland Terrace, to resolve the receivership proceeding months prior to his removal from 49-51 Riverside as part of a wellness check requested by a neighbor. Moreover, by the time of his removal from 49-51 Riverside, Mr. Savanovich had not lived in his "childhood home" for at least five (5) years. Returning to 49-51 Riverside was not an option because it had been condemned by the Town and the protective services investigators would not permit him to do so. Upon his release from a rehabilitation facility, Mr. Savanovich had nowhere to go and chose Traditions of Dedham over other options presented to him.

97.    In the Episode, the Netflix Defendants quote Ms. Belanger stating that Mr. Savanovich's goal was that "he wanted to live in his childhood home. Regardless of what John wanted, Attorney Peter Russell sold the property." This statement is false and defamatory of Attorney Louisa's efforts on Mr. Savanovich's behalf. Mr. Savanovich agreed to sell 26 Highland Terrace to resolve the receivership proceeding and executed paperwork for the sale months prior to the police's removal of him from 49-51 Riverside. After Mr. Savanovich's hospitalization and

diagnoses, the Probate Court appointed a conservator and a guardian for him. Attorney Golden requested and obtained permission from the Probate Court to sell the Riverside Properties over Attorney Cukier's vigorous opposition on his behalf.

98.    In the Episode, the Netflix Defendants and Mr. Savanovich suggest that Mr. Savanovich's "personal items, furniture and [] pictures" were thrown out before, what the Netflix Defendants claim was his childhood home, was sold for $485,000. These statements are false and defamatory. Mr. Savanovich agreed to sell 26 Highland Terrace months prior to his removal from 49-51 Riverside. Prior to and after the Probate Court allowed the sale of the Riverside Properties, Attorney Cukier had opportunities to remove any of his personal items. She declined to do so.

99.    In the Episode, the Netflix Defendants and Ms. Belanger suggest that Attorney Louisa "ignored" Mr. Savanovich's requests for the sale proceeds for "about a year" and quote Mr. Savanovich adding that "I never received a portion of the proceeds at all" and that Attorney Louisa "would never respond in any way." These statements are false and defamatory. Mr. Savanovich approved the proceeds from 26 Highland Terrace being held in R&A's client account before the sale, and he reviewed and approved payments out of those funds. He also received regular accountings. Upon appointment of Attorney Golden, she took control of the funds. For months, Mr. Savanovich failed to speak with or respond to inquiries from Attorney Louisa and Attorney Russell, which raised further concerns about his physical or financial wellbeing.

100.    In the Episode, the Netflix Defendants and Ms. Belanger accuse Attorney Louisa of having a "goal" to get Mr. Savanovich's properties and orchestrating a guardianship and conservatorship because their power of attorney was limited to 26 Highland Terrace. These statements are false and defamatory. Although there were powers of attorney in favor of R&A that provided authority to act relative to all six of Mr. Savanovich's properties, they were not used

to sell any of his real estate.  Mr. Savanovich sold 26 Highland Terrace in order to resolve the receivership proceeding.  Attorney Golden sought and obtained permission to sell the Riverside Properties from the Probate Court.

101.    In the Episode, the Netflix Defendants and Ms. Belanger further accuse Attorney Louisa of needing "to delay the sale" until Mr. Savanovich was under guardianship and explaining that is why they "needed a doctor to declare him incapacitated."  These statements are false and defamatory.  The sale of 26 Highland Terrace was consummated months earlier by Mr. Savanovich. Attorney Golden sought and received permission to sell the Riverside Properties from the Probate Court.  Mr. Savanovich's conditions were diagnosed by a licensed psychiatrist as a result of, among other reasons, the police needing to remove him from 49-51 Riverside, the deplorable conditions in which he had been living, and his failure to follow the advice of his advisors.

102.    In the Episode, the Netflix Defendants and Mr. Savanovich suggest that Attorney Louisa must have misused the guardianship process with others before Mr. Savanovich "because everything just went so smooth."  This suggestion is false and defamatory.  Attorney Louisa had never had to fulfill his ethical obligations out of concern for a client's physical or financial wellbeing before in his career, and he has not had to do so since.

103.    In the Episode, the Netflix Defendants show a copy of an invoice from R&A that remains subject to the Probate Court's impoundment order and, through innuendo, claim that R&A billed Mr. Savanovich more than $37,000 for Attorney Louisa's time in having Mr. Savanovich put into guardianship.  These claims are false and defamatory.  The bill covered four months of Attorney Louisa's unpaid work dealing with Mr. Savanovich's legal circumstances related to his removal from 49-51 Riverside, his hospitalization, his need for safe ongoing living arrangements,

and for preservation and protection of his assets, in addition to the preparation of the guardianship and conservatorship petitions that Attorney Louisa was ethically obligated to prepare. Attorney Golden submitted the invoice to the Probate Court and requested that R&A be paid, and the Probate Court approved its payment.

104.    In the Episode, the Netflix Defendants quote Ms. Belanger stating that after Attorney Russell, impliedly through Attorney Louisa's efforts, "gets the guardianship into place, they then sell John's five adjacent properties for $3.2 million" and that "John has absolutely no idea what balance he has left" and they "have not kept him informed." These statements are false and defamatory. Attorney Golden sought and received permission to sell the Riverside Properties from the Probate Court. The proceeds continue to be held by Attorney Golden in a client account for Mr. Savanovich with regular accounting requirements.

105.    In the Episode, the Netflix Defendants and Ms. Belanger claim that "the attorneys pressured John into an assisted living facility." The Netflix Defendants and Mr. Savanovich further elaborate on how Mr. Savanovich claims this occurred, and the Netflix Defendants then quote Ms. Belanger adding that there was "absolutely no reason why John should be forced to be paying $6,000 a month to be in an assisted living facility, when he had a home that was paid off for." These statements are false and defamatory. 49-51 Riverside had been condemned by the Town, and the protective services investigator would not permit him to return either. Mr. Savanovich chose Traditions of Dedham over other senior living facilities.

106.    Through an interspersed interview with a supposed expert, the Netflix Defendants refer to "cronyism" and then quote Ms. Belanger suggesting that those involved "do not want [Mr. Savanovich] to choose his own attorney." These statements are false and defamatory. Mr. Savanovich has been determined to be an incapacitated person under disability, and he remains

under guardianship and conservatorship. The Probate Court assigned him Attorney Cukier. When Mr. Savanovich expressed a desire to hire his own counsel, the Probate Court followed the law and appointed Attorney Galloway to represent him in the ongoing proceeding to determine if he has the capacity to do so.

107.    In the Episode, the Netflix Defendants display the impounded invoice from R&A a second time and suggest through quotes from Ms. Belanger and Mr. Savanovich that Attorney Louisa attempted to get him to take anti-psychotic medication. These statements are false and defamatory. The highlighted portion of the displayed invoice refers to Attorney Louisa's efforts to get Mr. Savanovich his blood thinner medication after it was delivered to 49-51 Riverside once he resided at Traditions of Dedham.

108.    In the Episode, the Netflix Defendants refer to letters from Mr. Savanovich's primary care doctor claiming that he is not incapacitated and state that "his guardians have continued to request that he be medicated." To the extent that viewers are led by the Netflix Defendants to believe that Attorney Louisa is responsible, these statements are false and defamatory. He has never served as Mr. Savanovich's guardian or conservator.

109.    The Episode also makes other false and defamatory accusations against Attorney Louisa.

**G.     The False Versions of Events Published in the Broadside.**

110.    At the time that Mr. Brennan wrote and published the May 2019 Article in the Broadside, he too had been improperly provided with impounded materials from the Probate Court by Ms. Belanger and had access to publicly available information. The Broadside Defendants published the May 2019 Article anyway.

111.    The May 2019 Article quoted Mr. Savanovich with knowledge that he was not a credible source and included several false and defamatory statements about Attorney Louisa just

- 27 -

like the ones that appeared in the Episode. They include, without limitation and as examples only, the following:

- Mr. Savanovich is quoted as saying that he found himself "in the clutches of these lawyers . . . they put a guardian on me, took everything, controlled everything. Tricked me into signing papers." He is further quoted as saying "I have a lawyer who tricked me and stole everything from me."

- Claiming that the threats from the Attorney General's Office were about shrubbery only. "Yes, shrubbery."

- "Russell [through Attorney Louisa's efforts] arranged for the sale of one of John's properties. . . . But John doesn't know where the money went. John said he was short-changed."

- Claiming that Attorney Louisa and Attorney Russell sold off the Riverside Properties after filing for a guardianship.

- Claiming that Mr. Savanovich "hasn't seen the money. He got shuffled off to an assisted living unit."

- Claiming that 26 Highland Terrace was sold "over John's objections."

- Quoting Mr. Savanovich as saying "I don't need assisted living. I'm not getting assistance. They're assisting themselves to my bank account and they're railroading me out of my properties."

- Quoting Mr. Savanovich as saying he only gets a "pittance" each month and that "I'm begging for my own money."

- Suggesting that Ms. Belanger is representing Mr. Savanovich.

- Quoting Mr. Savanovich as saying "They lied to me. They took everything. They tricked me into signing away my rights."

112.    The Broadside Defendants knew that these published statements, among others, were false and defamatory, recklessly disregarded their falsity, or should have known that they were false.

113.    The Broadside Defendants then published the June 2019 Article, which continued to advance the false narrative included in the May 2019 Article and being pushed by Ms. Belanger

and Mr. Savanovich. The Broadside Defendants knew that the version of events that it presented in the June 2019 Article was false and defamatory, recklessly disregarded its falsity, or should have known that it was false. They similarly knew that Ms. Belanger and Mr. Savanovich were not credible sources, recklessly disregarded their lack of credibility, or should have known of it.

114.    Less than two weeks after the streaming of the Episode on Netflix, the Broadside Defendants then published a third article, dated March 22, 2020 (the "March 2020 Article"). A copy of the March 2020 Article is attached hereto as **Exhibit M**.

115.    The March 2020 Article highlighted the airing of the Episode on Netflix and referred back to its 2019 coverage of Mr. Savanovich having "related that Massachusetts lawyers took everything away from him." In connection with the publishing of the March 2020 Article, the Broadside Defendants even republished the May 2019 Article along with it.

116.    The March 2020 Article exclaimed that "[w]e highly recommend you watch" the Episode and further advanced the false and defamatory narrative against Attorney Louisa with statements including, without limitation and as examples only, the following:

- Claiming that Mr. Savanovich "was transferred against his wishes, taken from his home – never to return to his childhood home – it was demolished. . . . they first took him to a hospital for a 'wellness check' then to an assisted living facility."

- "Lawyers sold off his more than $3 million estate. Everything, personal belongings, everything, gone. And, they tried to press anti-psychotics on him . . ."

- Suggesting through implication that Attorney Louisa had something to do with the discipline that Ms. Belanger was facing with the Board of Bar Overseers.

117.    At the time of their publishing of the March 2020 Article, the Broadside Defendants knew that the version of events that it presented was false and defamatory, recklessly disregarded its falsity, or should have known that it was false. They similarly knew that Ms. Belanger and Mr.

Savanovich were not credible sources, recklessly disregarded their lack of credibility, or should have known of it.

**H.    The Ongoing Damage to Attorney Louisa's Reputation.**

118.    In the weeks that followed the Episode's release, a global pandemic required increased numbers of Netflix subscribers to stay at home.  Upon information and belief, viewership of the Episode increased because of the state-at-home orders that were in place to deal with this health crisis.  It has been widely reported in the financial media that subscriptions to Netflix, a publicly traded company, have grown substantially since the crisis began.

119.    The publication of the Episode by the Netflix Defendants, and of the May 2019 Article, the June 2019 Article, and the March 2020 Article by the Broadside Defendants, has done irreparable damage to what had been the sterling reputation of Attorney Louisa.

120.    Attorney Louisa is being subjected to public hatred, disgrace, contempt, and ridicule.  He is also being contacted by clients, colleagues, professional acquaintances, and referral sources about the false version of events being portrayed.  Worse, he is being subjected to harassing and threatening emails, voicemails, letters, social media posts, stalking, and, most disturbingly, irreversible damage to his hard-earned reputation and business interests, some even requiring Attorney Louisa to make police reports.  Disturbing examples are attached hereto as **Exhibit N**.

121.    Attorney Louisa and The Law Office of Nicholas J. Louisa have been forced to send all telephone calls directly into voicemail.

122.    Attorney Louisa has had someone going through all of his Facebook contacts, both professional and personal, and reaching out to them to accuse Attorney Louisa of stealing Mr. Savanovich's money.

123.    The stress of watching his professional reputation, which he worked tirelessly

through seven years of post-secondary education and a decade of professional practice to build, be

utterly destroyed by the Episode in front of an international audience, and in the articles in the

Broadside, has had a severe and deleterious effect on Attorney Louisa's health.  He suffers from

anxiety, insomnia, lack of appetite, and rapid weight loss, among other symptoms.

124.    Most disturbingly, Ms. Belanger is emboldened and continues to use the publicity

that she has received to defame Attorney Louisa with lies through social media and on other

platforms.  Examples are attached hereto as **Exhibit O**.

I.     **The Probate Court's Recent Efforts to Respond to the Damage to Attorney Louisa's Reputation Caused by the Episode and the Articles in the Broadside.**

125.    In the aftermath of the Episode's publication, both Attorney Louisa and Attorney

Golden petitioned the Probate Court for some relief from the existing impoundment order on Mr.

Savanovich's files even while the proceeding to determine his capacity to retain his own counsel

was ongoing.

126.    After reviewing the Episode and the articles in the Broadside itself, the Probate

Court responded by issuing Further Temporary Orders dated June 8, 2020 ("Further Temporary

Orders"), which were expressly made not subject to the existing impoundment order.  A copy of

these Further Temporary Orders is attached hereto as **Exhibit P**.

127.    In the Further Temporary Orders, the Probate Court pushed back on the false and

defamatory accusations against Attorney Louisa made by the Netflix Defendants, the Broadside

Defendants and Ms. Belanger and did so in an explicitly public record.  For example, the Probate

Court shared the following from a still-impounded *Guardian Ad Litem* report:

> In his Second Report filed with the court on March 24, 2020, the
> GAL Investigatory concluded: 'Ultimately, all of the attorneys (that
> is, currently) of record (that is, including Conservator/Attorney
> Alexandra Golden and Attorney Nicholas Luisa [*sic*] but not

- 31 -

including Attorney Lisa Belanger) are trying to protect Mr. Savanovich.

Ex. P at p. 6. The Probate Court also made clear that the impoundment of Mr. Savanovich's files "was not requested by Attorney Nicholas Luisa [*sic*]." *Id.*

128.    The Further Temporary Orders also shared a number of other *Guardian Ad Litem* findings, conclusions and recommendations that it had adopted in this public record that the Netflix Defendants and the Broadside Defendants knew, should have known or recklessly disregarded, including, without limitation, the following:

- "John Savanovich lacked capacity to authorize, if he did, the disclosure of his records, their reproduction, representations about them, their print publication or airing on video media or otherwise."

- "Attorney Lisa Belanger appears in the [Episode] and discusses and discloses John Savanovich's personal and financial information which were impounded by this Court's orders. Those disclosures were not authorized by the Court."

- "Attorney Lisa Belanger well knew at least as of the first week of February 2019 that John Savanovich was under the protection of a court-ordered guardianship and a court-ordered conservatorship and that he was already represented by court-appointed counsel. Attorney Lisa Belanger then well knew of the court's impoundment orders."

- "The fact that John Savanovich was still under guardianship and conservatorship was well known by Attorney Lisa Belanger before the date of the Boston Broadside publication, the production and airing of the [Episode], and her May 2019 and June 2019 posts on her law firm website."

- "Attorney Lisa Belanger and/or her associate provided John Savanovich's court-impounded documents to the local newspaper Boston Broadside and to a purported production company 'Muddy Waters' and/or 'Jigsaw Productions' associated with the airing of the Netflix episode. In so doing, Attorney Lisa Belanger's conduct violated the Court's impoundment orders and the Uniform Rules on Impoundment Procedure number 13."

- "[In] a letter dated June 1, 2019 signed by John Savanovich and sent to Attorney Lisa Belanger terminating her representation of him . . . John Savanovich wrote: 'During the court hearing, your behavior was unprofessional and at times you appeared out of control.  You intentionally did not work with the opposing attorneys who were willing to revoke my guardianship . . . you went against my wish by fighting with them.  Because of you I'm still incapacitated in the eyes of the law and the court ruling has been unfavorable.  As you stated previously, you had no intention of settling the matter.  This was not in my best interest.  The drama that was created because of the article, only served you . . . .  I do not wish to be affiliated with you . . . .  The article you published worked against me and it damaged my case and I feel you did it to give yourself more exposure. . . .  This whole drama makes me feel exploited all over again.  Please do not contact me anymore and send me the rent money along with my court record and delete all copies.'"

- "John Savanovich did not agree to nor did he have any knowledge that his impounded documents and private medical and financial information would be appearing in the Boston Broadside newspaper, in a Netflix 'documentary' aired on the Internet, or anyplace else in public view . . . .  Quoting the GAL Investigator, 'Attorney Lisa Belanger took advantage of Mr. Savanovich and was attempting to use him and his cases to advance her own self-interests.'"

- "As one of his recommendations in his first report, the GAL Investigatory wrote 'sanction Attorney Belanger to reimburse Mr. Savanovich's estate for the costs of this investigation and other Attorneys' time related to this investigation as a purge amount' . . . [and] 'Forward this matter to the Board of Bar Overseers so they may investigate Attorney Belanger for various violations of the Code of Conduct.'"

Ex. P at pp. 3-6.  These and other statements in the Further Temporary Orders directly rebut many

of the false claims made in the Episode and by the Broadside.  Yet, these defendants have not

withdrawn or corrected their false statements.

**J.**     **The Probate Court's Findings and Order dated August 14, 2020.**

129.     On August 14, 2020, the Probate Court issued its 150-page Findings and Order decision related to Mr. Savanovich's guardianship and conservatorship, specifically his capacity to retain an attorney.  A copy of the Probate Court's Findings and Order is attached hereto as **Exhibit Q**.

130.     The Probate Court's Findings and Order make clear that the Defendants in this case either directly or through their agents illegally and knowingly entered into a conspiracy to obtain and publish information and documents which the Probate Court had ordered impounded, and that the Defendants knowingly and recklessly twisted the information they had illegally obtained for a variety of improper and self-interested reasons in order to sensationalize a false story about Attorney Louisa and others.  The Probate Court found their conduct so egregious that it ordered Mr. Savanovich's fiduciaries to issue no-contact and no-trespass orders to several of the Defendants.

131.     The Probate Court's Findings and Order is a scathing indictment of the Defendants' actions, and it makes clear the falsity of the publications about Attorney Louisa.  Yet, not one of the Defendants has removed their offending publications from public view.

### Count I – Defamation

132.     Plaintiff repeats and re-alleges the allegations set forth above.

133.     Attorney Louisa is a private citizen.

134.     Through their streaming of the Episode worldwide on Netflix, the Netflix Defendants published statements of and concerning Attorney Louisa that they knew to be false, recklessly disregarded their falsity, or should have known to be false in the exercise of reasonable care.  These statements are defamatory.

135.    Through their publication of the May 2019 Article, the June 2019 Article, and the March 2020 Article in the Broadside, the Broadside Defendants published statements of and concerning Attorney Louisa that they knew to be false, recklessly disregarded their falsity, or should have known to be false in the exercise of reasonable care. These statements are defamatory.

136.    Through various platforms, Ms. Belanger published statements of and concerning Attorney Louisa that she knew to be false, recklessly disregarded their falsity, or should have known to be false in the exercise of reasonable care. These statements are defamatory.

137.    Through their publications, the Netflix Defendants, the Broadside Defendants, and Ms. Belanger held Attorney Louisa up to public scorn and ridicule and destroyed his good name and reputation. The public has been left with the false understanding and belief that Attorney Louisa, among other things, fleeced Mr. Savanovich, tricked him into selling 26 Highland Terrance and the Riverside Properties, and stole his money. The public has been further led to believe that Attorney Louisa has engaged in unethical and criminal conduct against Mr. Savanovich and perhaps others.

138.    As a result of this defamation, Attorney Louisa has suffered, and continue to suffer, substantial harm and damages. He is entitled to public apologies and retractions and the award of significant monetary damages.

## Count II – Intentional Infliction of Emotional Distress

139.    Plaintiff repeats and re-alleges the allegations set forth above.

140.    In streaming the Episode, the Netflix Defendants intended to inflict emotional distress on Attorney Louisa or knew or should have known that emotional distress was the likely result of their conduct.

141.    In publishing the May 2019 Article, the June 2019 Article, and the March 2020 Article, the Broadside Defendants intended to inflict emotional distress on Attorney Louisa or knew or should have known that emotional distress was the likely result of their conduct.

142.    Through her speaking on various platforms, Ms. Belanger intended to inflict emotional distress on Attorney Louisa or knew or should have known that emotional distress was the likely result of their conduct.

143.    The acts described above by the Netflix Defendants, the Broadside Defendants, and Ms. Belanger are extreme and outrageous, beyond all bounds of possible decency, and utterly intolerable in a civilized community.

144.    The acts described above have caused, and continue to cause, Attorney Louisa to suffer severe emotional distress of a nature that no reasonable person should be expected to endure.

145.    As a result of this intentional infliction of emotional distress, Attorney Louisa has suffered, and continue to suffer, substantial damages.

## Count III – Negligent Infliction of Emotional Distress

146.    Plaintiff repeats and re-alleges the allegations set forth above.

147.    The Netflix Defendants, the Broadside Defendants, and Ms. Belanger have each failed to exercise reasonable care in their reporting and/or describing of events.

148.    This negligence has caused, and continues to cause, Attorney Louisa to suffer severe emotional distress, including, without limitation, by the physical manifestation of objective symptomology, and any reasonable person would have suffered emotional distress under these circumstances.

149.    As a result of this negligent infliction of emotional distress, Attorney Louisa has suffered, and continue to suffer, substantial damages.

### Count IV – Civil Conspiracy

150.     Plaintiff repeats and re-alleges the allegations set forth above.

151.     Ms. Belanger and the Netflix Defendants knowingly engaged in a common plan, utilizing unlawful means, to defame and inflict emotional distress upon Attorney Louisa by obtaining, in violation of a court order, selectively sharing among themselves, and then publishing to third parties misleading information from the Probate Court concerning Mr. Savanovich and Attorney Louisa's representation of him in the Episode.

152.     Ms. Belanger and the Broadside Defendants likewise knowingly engaged in a common plan, utilizing unlawful means, to defame and inflict emotional distress upon Attorney Louisa by obtaining, in violation of a court order, selectively sharing among themselves, and then publishing to third parties misleading information from the Probate Court concerning Mr. Savanovich and Attorney Louisa's representation of him in the May 2019 Article, the June 2019 Article, and the March 2020 Article.

153.     As a result of these civil conspiracies involving Ms. Belanger, Attorney Louisa has suffered, and continue to suffer, substantial damages. The Netflix Defendants, the Broadside Defendants and Ms. Belanger should all be found jointly and severally liable to Attorney Louisa.

WHEREFORE, Plaintiff respectfully requests that this Court grant it the following relief on this Amended Complaint and Jury Demand:

A.     on Count I, (i) find in favor of Plaintiff, and against the Netflix Defendants, the Broadside Defendants, and Ms. Belanger, (ii) order public apologies and retractions, and (iii) award Plaintiff monetary damages;

B.     on Counts II through IV, (i) find in favor of Plaintiff, and jointly and severally against the Netflix Defendants, the Broadside Defendants, and Ms. Belanger, and (ii) award Plaintiff monetary damages; and

C.     grant such other and further relief as this Court deems equitable and just.

## Jury Demand

Pursuant to Rule 38(b) of the Massachusetts Rules of Civil Procedure, Attorney Louisa hereby demands a jury on all claims and issues so triable.

Respectfully submitted,

PLAINTIFF NICHOLAS J. LOUISA, ESQ.,

By his attorneys,

Howard M. Cooper (BBO No. 543842)
Matthew S. Furman (BBO No. 679751)
TODD & WELD, LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel:    (617) 720-2626
Email: hcooper@toddweld.com
        mfurman@toddweld.com

Dated:  August 18, 2020